FILED

JUN  2 2017

Mark C. McCartt, Clerk
U.S. DISTRICT COURT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) Teri Flanagan, on behalf of herself and all others similarly situated, | Civil Action No. _____ |
| Plaintiffs, | |
| v. | **1 7 CV   3 1 5 JED -** MJX |
| | **CLASS ACTION COMPLAINT** |
| (1) ACCESS MIDSTREAM PARTNERS, L.P. (n/k/a WILLIAMS PARTNERS, L.P.); (2) CHESAPEAKE ENERGY CORPORATION; (3) CHESAPEAKE OPERATING, L.L.C.; (4) CHESAPEAKE EXPLORATION, L.L.C.; (5) CHESAPEAKE ENERGY MARKETING INC.; (6) CHESAPEAKE MIDSTREAM PARTNERS, LP; and, (7) TOTAL E&P USA, INC. | **JURY TRIAL DEMANDED** |
| | Per LCvR3.1, this case is unrelated to any other previously filed case. |
| Defendants. | |

## CLASS ACTION COMPLAINT

Fees Pd
7 Summons

## TABLE OF CONTENTS

I.     INTRODUCTION ..............................................................................1

II.    JURISDICTION AND VENUE ..............................................................2

III.   PARTIES........................................................................................3

       A. Plaintiffs...............................................................................3

       B. Defendants ...........................................................................4

IV.    FACTUAL ALLEGATIONS..................................................................6

       A. Extraction of Natural Gas by Hydraulic Fracturing and "Gathering"
          Costs....................................................................................6

       B. Chesapeake Turns to Access Midstream to Avoid Financial
          Collapse................................................................................9

       C. Lessors are Charged Inflated and Unreasonable Royalty
          Deductions............................................................................18

V.     USE OF INTERSTATE MAILS AND WIRES TO INJURE PLAINTIFFS AND
       THE CLASS.....................................................................20

VI.    CLASS ACTION ALLEGATIONS ......................................................22

VII.   CAUSES OF ACTION........................................................................24

VIII.  PRAYER FOR RELIEF......................................................................36

IX.    DEMAND FOR JURY TRIAL...............................................................37

i

Plaintiff Teri Flanagan, individually and on behalf of others similarly situated, bring this class action against Defendants.

## I.    INTRODUCTION

1.    Since at least 2009, Chesapeake engaged in unlawful conduct to improperly extract millions of dollars in royalties owed to Plaintiffs and other lessors by artificially manipulating and deducting from gas royalty payments the cost of midstream Gathering, Compressing, Dehydrating, Treating, and Processing (GCDTP) services. Defendants intentionally manipulated the deductions at issue in this Action as part of a fraudulent scheme to enrich themselves at the expense of Plaintiffs and similarly situated royalty owners.

2.    As outlined in a March 13, 2014 article published by *ProPublica* entitled *Chesapeake Energy's $5 Billion Shuffle*, available at http://www.propublica.org/article/chesapeake-energys-5-billion-shuffle, (last visited March 28, 2017) (the "ProPublica Report"), Chesapeake conspired with Access Midstream to continue its scheme to extract inflate royalty deductions from lessors.[1] According to *ProPublica*, Chesapeake conspired with Access Midstream to artificially inflate deductions charged to royalty owners in order to satisfy an off-balance-sheet loan from Access Midstream that was disguised as asset sales. The purpose of the off-balance sheet loan was to hide Chesapeake's need to "raise billions of dollars quickly" without alerting the market to its financial troubles when it was already saddled with billions of dollars in debt. *See id.*

---

[1] *ProPublica* is a highly respected non-profit organization that produces investigative journalism. *ProPublica* has been awarded two Pulitzer Prizes and a Peabody Award (the highest honor in broadcast journalism) in 2013. *See* http://www.propublica.org/awards/, last accessed August 26, 2014. Moreover, *ProPublica's* investigations have been cited by federal courts when evaluating the sufficiency of plaintiffs' pleadings. *See e.g., Garden City Employees' Retirement System v. Psychiatric Solutions, Inc.*, 2011 WL 1335803, at *27 (M.D. Tenn. Mar. 31, 2011) (noting allegations based on ProPublica's investigation).

3.      Given their close relationship, Access Midstream, Chesapeake's co-conspirator, was more than willing to participate in the scheme. In return for "purchasing" $4.76 billion in gas gathering lines and other midstream assets from Chesapeake, Access Midstream was guaranteed to recover $5 billion plus a 15% return on its pipelines over the next decade— at least a portion of which would be shouldered by inflated expenses charged to the Class. *See id.*

4.      The deals were highly favorable to Access Midstream. According to J. Michael Stice, Access Midstream's Chief Executive Officer, "[i]t doesn't get any better than this." *See id.* For royalty owners, however, the Chesapeake-Access Midstream deals could not get any worse.

5.      Plaintiffs bring this class action lawsuit on behalf of themselves and all others similarly situated pursuant to the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, as well as unjust enrichment and civil conspiracy to commit the underlying offenses and to recover the costs of suit, including reasonable attorneys' fees, for the injuries that Plaintiffs and other royalty owners sustained as a result of Defendants' illegal conduct.

6.      Despite realizing that Chesapeake was charging excessive midstream service costs to royalty owners, Total nonetheless joined and extended the wrongdoing by: (a) buying into the Class leases; (b) continuing the excessive charges; (c) entering into a separate agreement with Access Midstream to try to cover it up and avoid the illegal stench of the original affiliate, self-dealing transaction between Chesapeake and Access Midstream; and, (d) encouraging Chesapeake to take midstream deductions from royalty owners for the same midstream services Chesapeake had been providing without royalty deductions.

## II.      JURISDICTION AND VENUE

7.      This Court has jurisdiction over this class action pursuant to 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005, because, as alleged herein, the matter in

2

controversy exceeds $5,000,000.00, exclusive of interest and costs, and is a class action in which one or more members of the Class is a citizen of a state different from a Defendant. See 28 U.S.C. § 1332(d)(2)(A). The Plaintiff is a citizen of Texas. Chesapeake and Access Midstream are corporate citizens of Oklahoma.

8.    This Court has original jurisdiction over Plaintiffs' First and Second Causes of Action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 18 U.S.C. §§ 1962 and 1964 (prohibited activities; civil remedies).

9.    This Court has supplemental jurisdiction over Plaintiffs' Third, Fourth, Fifth, and Sixth Causes of Action pursuant to 28 U.S.C. § 1367, as those claims form part of the same case or controversy as those claims for which this Court has original jurisdiction.

10.    Venue is proper in this Court because Access Midstream is a corporate resident of the Northern District of Oklahoma and all defendants are residents of Oklahoma. *See* 28 U.S.C. § 1391(b)(1).

### III.    PARTIES

**A.    Plaintiffs**

11.    Plaintiff Teri Flanagan is a citizen of Texas, and has a royalty interest in the Driver TRT 1H well in Tarrant County, Texas for which Chesapeake Operating, LLC is the operator and payor of royalty. One of the other Defendant Chesapeake entities along with Total is a lessee and/or working interest owner in Plaintiff's well.

12.    Plaintiffs identified above along with the Class are herein collectively referred to as "Plaintiffs" or the Class.

13.    Acting as a consortium of oil and gas production companies, Defendants, including, but not limited to Chesapeake Operating, LLC (formerly Chesapeake Operating, Inc.), and Chesapeake Exploration, LLC, leased thousands of acres of land to extract natural gas.

3

## B.    Defendants

14.    Defendant Chesapeake Energy Corporation was the second largest producer of natural gas in the United States. Chesapeake Energy Corporation is a publicly traded oil and gas company incorporated in Oklahoma with its headquarters at 6100 North Western Avenue, Oklahoma City, Oklahoma 73118. Chesapeake Energy Corporation's operations are focused on the development of onshore unconventional and conventional natural gas, especially through the use of hydraulic fracturing, or "fracking," in various shale formations throughout the United States, including the Barnett, Eagle Ford, Haynesville, and Mid-Continent region shale formations in Texas.

    a.    Defendant Chesapeake Operating, LLC (f/k/a Chesapeake Operating, Inc.) (COI) is a wholly owned subsidiary of Chesapeake Energy Corporation, with its principal place of business in Oklahoma, and is an operator of Oklahoma wells in the Class as well as a payor of royalties in Class Wells.

    b.    Defendant Chesapeake Exploration, LLC (f/k/a Chesapeake Exploration, L.P) (CELLC) is a wholly owned subsidiary of Chesapeake Energy Corporation, with its principal place of business in Oklahoma, and is a lessee of Oklahoma wells in the Class.

    c.    Defendant Chesapeake Energy Marketing, LLC (f/k/a Chesapeake Energy Marketing, Inc. or CEMI) is a wholly owned subsidiary of Chesapeake Energy Corporation, with its principal place of business in Oklahoma, and is the marketer the gas from Oklahoma wells in the Class.

    d.    Defendant Chesapeake Midstream Partners, L.P. (CMP) is a controlled affiliate of Chesapeake Energy Corporation which was its general partner, with its principal place of business in Oklahoma, owner of the midstream assets over which the gas from Class Wells was gathered and other midstream services performed, and in July 2012, changed

its name to Access Midstream Partners, L.P. It will be served as its subsequent entity, Access Midstream L.P.

e. Collectively, all Chesapeake entities are referred to as Chesapeake, and each can be served by serving their Registered Agent, The Corporation Company, 1833 S. Morgan Road, Oklahoma City, OK 73128.

15. Defendant Access Midstream L.P. (Access Midstream) was a Delaware limited partnership, with a stated address at 525 Central Park Drive, Oklahoma City, Oklahoma 73105. Access Midstream was originally formed as Chesapeake Midstream Partners, L.P. on August 3, 2010. Through a series of mergers completed on February 2, 2015, Access Midstream became Williams Partners, L.P. a Delaware limited partnership with its principal place of business and headquarters at One Williams Center, Tulsa, Oklahoma, 74172-0172.[2] Williams Partners, L.P. is a citizen of Oklahoma with its principal place of business in this judicial district. Williams Partners, L.P. will continue to be referred to herein as "Access Midstream." Williams Partners, L.P. may be served with process through its Registered Agent, The Corporation Company, 1833 S. Morgan Road, Oklahoma City, OK 73128.

---

[2]  Williams Partners, LP described the transaction to the United States Securities and Exchange Commission this way:

> Pursuant to an Agreement and Plan of Merger dated as of October 24, 2014, the general partners of Williams Partners L.P. and Access Midstream Partners, L.P. agreed to combine those businesses and their general partners, with Williams Partners L.P. merging with and into Access Midstream Partners, L.P. and the Access Midstream Partners, L.P. general partner being the surviving general partner (ACMP Merger). Following the completion of the ACMP Merger on February 2, 2015, as further described below, the surviving Access Midstream Partners, L.P. changed its name to Williams Partners L.P., and the name of its general partner was changed to WPZ GP LLC.

Williams Partners, L.P., Annual Report (Form 10-K), at 5 (Feb. 2016) (available at https://www.sec.gov/Archives/edgar/data/1483096/000148309616000021/wpz_20151231x10k.h tm) (last accessed May 2, 2017). Because they are effectively the same entity, the Complaint uses Access Midstream Partners and Williams Partners interchangeably throughout.

15.     Defendant Total E&P USA, Inc. is a Delaware corporation with its principal place of business in Houston, Texas, and has a non-operating working interest in Plaintiff's lease and Class leases. Total may be served by serving its Registered Agent, The Corporation Company, 1833 S. Morgan Road, Oklahoma City, OK 73128.

16.     Chesapeake, Access Midstream, and Total are referred to herein collectively as the "Defendants."

## IV.     FACTUAL ALLEGATIONS

**A.     Extraction of Natural Gas by Hydraulic Fracturing and sharing of "Post-Production" Costs between the Lessor and the Lessee.**

17.     Beginning in the early 2000's, the development of advanced hydraulic fracturing technology allowed oil and gas exploration and production (E&P) companies, such as Chesapeake, to access large deposits of natural gas from various tight shale formations throughout the United States, including in Texas, once thought to be inaccessible and/or uneconomical to explore. Plaintiff and the Class's minerals are in the Barnett, Eagle Ford, Haynesville, and Mid-Continent region formations in Texas.

18.     To gain access to these shale deposits, the E&P companies entered into leases with the owners of the mineral rights in lands that overlie these deposits, such as Plaintiffs. These leases are contracts whereby the E&P companies[3] agree to incur the expense and risk of exploring for and producing natural gas under the leased lands in exchange for the mineral owner accepting a royalty, usually stated as a fraction or percentage of the proceeds from the sale of the produced gas. The mineral owners benefit from this arrangement to the extent that the expense, risk, and requisite expertise and resources required to explore for and produce natural gas from these tight

---

[3]   Also referred to as "lessee" under the lease or "producer" and/or "operator" when discussing a particular well.

shale deposits is well beyond the means of the typical mineral owner. Unfortunately, this arrangement places the mineral owner in a position of extreme information asymmetry, rendering the mineral owner wholly dependent on the producer to operate the wells in a safe and ethical manner and to account for their royalty in an honest and transparent fashion.

19.     The expenses incurred by the lessee/producer to drill a well and bring the gas to the surface are referred to as "production" costs. Production costs are not shared by the royalty owners. After the gas is brought to the surface, the lessee/producer must transform the gas into a marketable condition and move it to a market for sale. Natural gas, as consumers use it, is much different from the raw gas that is brought from underground up to the wellhead. The major interstate transmission pipelines that transport natural gas throughout the United States usually impose restrictions on the make-up of the natural gas that is allowed into the pipeline. That means before the natural gas can be transported to a final customer it must be purified into interstate or intrastate "pipeline quality" natural gas. The costs of these "post-production" processes, also referred to as "midstream services," are, under Texas law, usually deducted from the starting market value for gas products before paying royalty owners.

20.     The midstream services that follow removal of raw gas from the wellhead, but precede entry of the gas into an interstate transmission pipeline, usually include some combination of "Gathering," "Compression," "Dehydration," "Treating," and "Processing" (GCDTP)[4] depending on the characteristics of the gas as it emerges from underground. "Gathering" refers to collecting the gas from multiple wells in a small diameter pipeline system and moving the gas to the inlet of an intrastate or interstate transportation pipeline. "Compression" involves boosting the pressure of the gas stream to a p.s.i. sufficient for the gas to enter the final interstate transportation

---

[4]    Access Midstream Partners, L.P., Form 10-K, filed February 21, 2014.

7

pipeline. "Dehydration" refers to removing all or most of the water vapor inherent in raw gas, which, without dehydration, is "saturated" with water vapor. "Treating" refers to the many processes that can be required to remove impurities from the gas stream to meet pipeline quality specifications, such as amine scrubbing to remove $CO_2$ and $H_2S$. "Processing" refers to the series of steps, usually undertaken in a large gas processing plant, necessary to separate the constituent parts of the gas stream for removal of impurities or separate sale, such as fractionation whereby natural gas liquids (NGLs) are separated from the methane and then from each other.

21.     In this case, wholly-owned subsidiaries of Chesapeake are the lessees/producers responsible for bringing the gas to the surface, getting the gas in marketable condition, selling the gas, and paying royalty. Access Midstream provides the midstream services after the gas is brought to the surface and before it is sold at the interstate pipeline.

22.     As illustrated in Access Midstream's 2013 Annual Report filed with the Securities and Exchange Commission ("SEC") on Form 10-K on February 21, 2014, Access Midstream operates between the gathering line inlet and the interstate pipeline inlet:



23.     While federal laws and regulations limit fees that can be charged on the interstate pipelines to prevent gouging, companies such as Access Midstream are free to set their fees for midstream services.[5] As this case and the many natural gas royalty disputes before it demonstrate,[6]

---

[5]  *See ProPublica Report.*
[6]  Christopher Helman. *'Screwing Royalty Owners Means Chesapeake Is Stealing Cash'*, FORBES. Mar. 17, 2014, *available at* http://onforb.es/1g3bJ1o (last accessed February 26, 2015).

E&P companies such as Chesapeake have the means and the economic incentives to structure their operations, contractual relationships, and accounting procedures in a way that saddles the royalty owners with a disproportionate share of midstream service costs.

**B.   Chesapeake Turns to Access Midstream to Avoid Financial Collapse**

24.    Despite their dominant role in natural gas extraction in the United States, Chesapeake was experiencing severe financial difficulty in the late 2000's, including funding gaps, reportedly due to major capital expenditures and lower natural gas prices and cash flow. As a result, Chesapeake needed cash quickly to service its outstanding debt and fund its operations.[7]

25.    The diagram below summarizes the evolution of Chesapeake Midstream Partners into Access Midstream Partners into Williams Partners, L.P. The transactions, along with others in the evolution, are described more fully in the paragraphs below.

---

[7]   *See, e.g.,* Christopher Helman, *Chesapeake Energy's New Plan:   Desperate Measures for Desperate Times,* FORBES, Feb. 13, 2012 (the "Forbes Report").

## THE PATH FROM CHESAPEAKE TO ACCESS TO WILLIAMS

| September 2009 | August 2010 | July 2011 | July 2012 | December 2012 | June 2014 | October 2016 |
|---|---|---|---|---|---|---|
| • Chesapeake and Global Infrastructure Partners ("GIP") create Midstream JV with the contribution of midstream assets (including Barnett and MidContinent) from Chesapeake and $588 million from GIP for 50% ownership.<br><br>• Total buys 25% of Chesapeake's upstream Barnett interest for $800 million in cash, plus $1.45 billion toward the field's development. | • Chesapeake and GIP convert Midstream JV into Chesapeake Midstream Partners, LP (NYSE: CHKM).<br><br>• The IPO for CHKM yields $475 million for Chesapeake and GIP. | • Chesapeake and Total begin taking deductions from royalty owners on the affiliate gathering system for production in May 2011. | • Chesapeake sells its general and limited partnership interests in CHKM to GIP for $2.0 Billion.<br><br>• Chesapeake Midstream Partners changes its name to Access Midstream Partners. | • Access acquires Chesapeake Midstream Operating (which holds non-Barnett areas such as Eagle Ford and Marcellus), a wholly owned subsidiary from Chesapeake for $2.16 Billion.<br><br>• Williams acquires 50% interest in Access from GIP for $2.14 Billion. | • Williams acquires the remaining interest in Access from GIP for $5.995 Billion. | • Total buys the remaining 75% of Chesapeake's Barnett shale assets by paying Williams $420 million "for a fully restructured, competitive gas gathering agreement" plus another $138 million to be released from three other midstream capacity reservation contracts. Chesapeake pays Williams $334 million more to terminate the gathering agreement.[1] |

[1]   http://www.reuters.com/article/us-total-barnett-shale-idUSKCN11F1AU (emphasis added)(last accessed May 9, 2017).

Chesapeake reported this transaction to the United States Securities and Exchange Commission this way:

> In October 2016, we conveyed our interests in the Barnett Shale operating area located in north central Texas and received from the buyer aggregate net proceeds of approximately $218 million. We sold approximately 212,000 net developed and undeveloped acres, approximately 2,900 operated wells which produced an average of approximately 59 mboe per day in the 2016 third quarter, along with other property and equipment. We simultaneously terminated most of our future natural gas gathering and transportation commitments associated with this asset. In connection with this disposition, we paid $361 million to terminate certain natural gas gathering and transportation agreements, and paid $58 million to restructure a long-term sales agreement. We may be required to pay additional amounts in respect of certain title and environmental contingencies. Additionally, we recognized a charge of $284 million related to the impairment of other fixed assets sold in the divestiture. **By exiting the Barnett Shale, we eliminated approximately $1.9 billion of total future midstream and downstream commitments, leading to an expected increase in our operating income for 2017 through 2019 of $200 to $300 million annually.**

Chesapeake Energy Company, Annual Report (Form 10-K), at 44 (Feb. 3, 2017) (emphasis added).

26.     On August 3, 2010, Chesapeake formed Access Midstream Partners[8] and began to spin off its midstream assets, which included its natural gas gathering and intrastate pipeline operations, through a series of sales to Access Midstream in order to fund its ongoing operations. During this time, Chesapeake was using its subsidiaries to artificially inflate deductions charged to lessors.

27.     In December 2011, Chesapeake completed the sale of Appalachia Midstream Services, L.L.C. ("AMS"), a wholly owned subsidiary of Chesapeake Midstream, and AMS's Marcellus Shale midstream assets for $865 million in total consideration.[9]

28.     Still needing "to fund the company's anticipated capital expenditures during 2012 and provide additional liquidity for 2013," Chesapeake announced in February 2012 its intent to sell additional midstream assets.[10]

29.     On December 20, 2012, Chesapeake completed the sale of its subsidiary Chesapeake Midstream Operating, L.L.C. ("CMO") to Access Midstream, including Chesapeake Midstream's Eagle Ford and Haynesville midstream assets, for $2.16 billion in total consideration (the "CMO Acquisition").[11]

---

[8]   The partnership was originally named "Chesapeake Midstream Partners, L.P." It was renamed "Access Midstream Partners, L.P." in July 2012.
[9]   Access Midstream Partners, L.P., Form 8-K, filed Jan. 4, 2012.
[10]   Chesapeake Energy Corporation, *Chesapeake Energy Corporation Provides Details on its Financial Plan for 2012*, BUSINESS WIRE, Feb. 13, 2012.
[11]   Access Midstream Partners, L.P., Form 8-K, filed Dec. 26, 2012.

**DIAGRAM OF CHESAPEAKE–ACCESS MIDSTREAM ASSET SPIN-OFFS**



30.     When Chesapeake sought to spin off its gathering operations, it turned to J. Michael Stice— the President and Chief Operating Officer of Chesapeake Midstream and Senior Vice President of Natural Gas Projects for Chesapeake from November 2008 through December 2012—to run the operation. Stice then became the Chief Executive Officer of Access Midstream following its acquisition of the CMO midstream assets.[12]

31.     Domenic J. Dell'Osso, Jr.—as the Executive Vice President and Chief Financial Officer of Chesapeake since November 2010 and Chief Financial Officer of Chesapeake Midstream from August 2008 to November 2010—was also intimately familiar with the scheme.

32.     Stice and Dell'Osso have served as directors of Access Midstream's general partner, Access Midstream Partners GP, L.L.C., since July 2012 and July 2011, respectively.

33.     According to the *ProPublica* Report, post-spinoff agreements between Chesapeake and Access Midstream guarantee that Chesapeake and certain of its subsidiaries and affiliates get a rebate of some of the monies they will pay out to Access Midstream in the form of payments for services and additional assets.[13]

34.     Among other specific items, Access Midstream received a guarantee from Chesapeake that personnel and employees would be made available to it during a transitional period and that certain services would be provided to Access Midstream that would be paid going forward.[14] Notably, Access Midstream is managed and directed by former and current Chesapeake officers, has made extensive use of other Chesapeake employees in conducting its operations, and

---

[12]   In October 2014, when Williams bought Access Midstream, Stice retired and cashed out with $46.4 million. At the same time, COO Robert Purgason received $31.1 million (but stayed with Williams) and CFO David Shiels retired with $16 million.

[13]   *See ProPublica* Report.

[14]   Access Midstream Partners, L.P., Form 10-K, filed Feb. 25, 2013; *see also* Access Midstream Partners, L.P., Form 8-K, Exhibit 10.2, filed Dec. 19, 2012; Access Midstream Partners, L.P., Form 8-K, Exhibit 10.2, filed June 20, 2012.

continues to pay Chesapeake and other affiliates and subsidiaries for a variety of services.

35.    In connection with the creation of Access Midstream, Access Midstream entered into a gas gathering agreement with respect to the Barnett Shale and Mid-Continent region with certain subsidiaries of Chesapeake.[15] Access Midstream entered into subsequent gas gathering contracts with certain subsidiaries and joint ventures of Chesapeake with respect to the Barnett Shale and Mid-Continent region. *See id.*

36.    In connection with Marcellus and CMO acquisitions in 2011 and 2012, Access Midstream replaced Chesapeake Midstream as the beneficiary of certain contractual obligations and entered into new gas gathering agreements with respect to the Eagle Ford, Utica, Niobrara, Haynesville and Marcellus basins with certain Chesapeake subsidiaries. The gas gathering agreements are collectively referred to hereinafter as the "Gathering Agreements".[16]

37.    Pursuant to the Gathering Agreements, Chesapeake's subsidiaries agreed to pay Access Midstream for natural gas gathering and transportation services, including intrastate transport.[17]

38.    For example, under the Gathering Agreement covering CMO's former Marcellus Shale assets (the "Marcellus Gathering Agreement"), Chesapeake Appalachia, LLC's payments to Access Midstream for gas gathering and transportation services are referred to as the "Marcellus fee" and described as "a cost-of-service based fee."[18]

39.    However, this characterization is misleading and false. As the *ProPublica* Report details, the fee is not "cost-of-service" based but was instead intended to provide Access

---

[15]    Access Midstream Partners, L.P., Form 10-Q, filed May 10, 2012.

[16]    *See, e.g.,* Access Midstream Partners, L.P., Form 8-K, filed Dec. 26, 2012.

[17]    *Id.*

[18]    *Id.* There are also "Eagle Ford" and "Haynesville" fees set forth in those Gathering Agreements. Those fees are likewise described as "cost-of service" fees. *See id.*

Midstream with a guaranteed, above-market return as an incentive and consideration for the payments it made to Chesapeake. As explained by *ProPublica*, "[a]n executive at a rival company who reviewed the deal at ProPublica's request said it looked like *Chesapeake had found a way to make the landowners pay the principal and interest on what amounts to a multi- billion dollar loan to the company from Access Midstream*."[19]

40.     In fact, the Marcellus Gathering Agreement has a 15-year term and provides that, on January 1 of each year, the Marcellus fee will be recalculated to provide "a specified pre-income tax rate of return on invested capital."[20] In other words, it was structured to insure a guaranteed rate of return to Access Midstream for a 15-year period.[21]

41.     *ProPublica* has reported that the rate of return is 15% per year: "Chesapeake pledged to pay Access enough in fees to *repay the $5 billion plus a 15 percent return* on its pipelines."[22]

42.     Chesapeake's ability to follow through on its promise to lock in Access Midstream's rate of return relies on continued inflation of gathering costs and other services paid to Access Midstream and deducted from oil and gas lessors' royalty payments.

43.     Fully aware of the true market rates of such services, Chesapeake and its subsidiaries agreed to this above-market rate of return and then Chesapeake agreed to pay Access Midstream supra-competitive prices for natural gas gathering and transportation services, as part of the renewed agreement with Access Midstream and to repay Access Midstream's off-balance sheet loan to Chesapeake.

---

[19]  *See ProPublica* Report.
[20]  *Id.*
[21]  *See Forbes* Report. The Eagle Ford Gathering Agreement has a similar fee redetermination provision that provides for a 20-year term. *See* Access Midstream Partners, L.P., Form 8-K, filed Dec. 26, 2012.
[22]  *See ProPublica* Report.

44.     Chesapeake's subsidiaries, including but not limited to Chesapeake Operating, LLC (formerly known as Chesapeake Operating, Inc.) and Chesapeake Exploration, LLC, have, in turn, passed the costs of the services along to Texas oil and gas lessors, such as Plaintiffs, by deducting the inflated expenses built into the Gathering Agreement Fees from lessors' royalty payments.

45.     The *ProPublica* Report details how Chesapeake subsidiaries have deducted amounts far in excess of their payments to Access Midstream for gas gathering and transportation services. Chesapeake's subsidiaries have paid fees, which are then charged to lessors, for gas pipeline transport to Access Midstream that are many multiples of Access Midstream's actual costs. In one example, *ProPublica* reported that the markup was in excess of 3,000%:[23]

46.     As one of Chesapeake's competitors stated, "[t]hey were trying to figure out a way to raise money and keep their company alive [and] they looked at it as a way to get disguised financing ... that is going to be repaid at a premium."[24]

47.     These wrongful royalty deductions are n o t  detailed in Plaintiff and the Class's royalty check stub statements even though Defendants expect and know that Plaintiffs rely on the royalty statements to accurately reflect the actual deductions incurred and the reasonableness of the amounts deducted. Neither was the case. Plaintiff and the Class relied on the royalty check stub statements to their detriment.

48.     These deductions were inflated, improper, completely unrelated to the "cost of services," did not serve to enhance the marketability of gas, and instead, merely served to enrich the co-conspirators who devised the scheme.

49.     The benefit to Access Midstream is clear. Access Midstream's predominant source

---

[23]  *Id.*
[24]  *Id.*

of revenue is gathering fees and Chesapeake accounts for approximately 84% of Access Midstream's business.[25]

50.       Due in part to Stice's positive statements and other disclosures about the nature of Access Midstream's guaranteed revenues, the broader market is also beginning to understand the boon to Access Midstream.   As of June 16, 2014, Access Midstream's common stock (NYSE: ACMP) was trading at $66.57 per share, more than double the $32.41 per share it traded at on December 14, 2012, the week before the acquisition of Chesapeake Midstream's assets was completed. Williams Partners' acquisition of Access Midstream demonstrates this dramatic rise in value. Williams acquired a 50% interest in Access Midstream in 2012 for $2.14 Billion. Four years later, in 2016, Williams acquired the remaining 50% interest, paying $5.995 Billion, almost three (3) times more than $21.4 Billion the purchase price in 2012.

51.       In October 2016, to get out from under the excessively costly Chesapeake-Access (now Williams) contracts, Total bought the remaining 75% of Chesapeake's Barnett Shale assets by paying Williams $420 million "for a fully restructured, **competitive** gas gathering agreement" plus another $138 million to be released from three (3) other midstream capacity reservation contracts. Chesapeake also had to pay Williams $334 million more to terminate the unfavorable gathering agreement.[26]

---

[25] *See* ProPublica Report.

[26] http://www.reuters.com/article/us-total-barnett-shale-idUSKCN11F1AU (emphasis added) (last accessed May 9, 2017). Chesapeake reported this transaction to the United States Securities and Exchange Commission this way:

> In October 2016, we conveyed our interests in the Barnett Shale operating area located in north central Texas and received from the buyer aggregate net proceeds of approximately $218 million. We sold approximately 212,000 net developed and undeveloped acres, approximately 2,900 operated wells which produced an average of approximately 59 mboe per day in the 2016 third quarter, along with other property and equipment. We simultaneously terminated most of our future natural gas gathering and transportation commitments associated with this asset. In

C.   **Lessors are Charged Inflated and Unreasonable Royalty Deductions**

52.     To facilitate Chesapeake's drilling and fracking operations in the Barnett, Eagle Ford, Haynesville, and Mid-Continent formations, Chesapeake's subsidiaries, including but not limited to Chesapeake Operating, LLC, and Chesapeake Exploration LLC., entered into agreements to lease land from Texas mineral owners. In some cases, Chesapeake's subsidiaries purchased rights to existing leases to which it becomes a party as lessee. These lease agreements, such as those originally entered into by the Plaintiffs, give Chesapeake's subsidiaries the right to extract oil and natural gas from lessors' lands and to transport and sell the oil and gas.

53.     In return for the right to extract oil and gas, the lease agreements promise a royalty to the lessors based on the price ultimately realized by Chesapeake's subsidiaries for the oil and gas.

54.     Plaintiff and the Class are parties to leases with Chesapeake and/or Total, and the royalty clause allows midstream deductions, but not in excess of actual cost or which are unreasonable in amount. Yet, Defendants engaged in a scheme that charged midstream deductions in excess of actual cost and/or unreasonable in amount.

55.     Notwithstanding these limitations, Defendants, under the guise of Chesapeake's subsidiaries' agreements with lessors, exploited deductions language from the lease agreements

_____

connection with this disposition, we paid $361 million to terminate certain natural gas gathering and transportation agreements, and paid $58 million to restructure a long-term sales agreement. We may be required to pay additional amounts in respect of certain title and environmental contingencies. Additionally, we recognized a charge of $284 million related to the impairment of other fixed assets sold in the divestiture. **By exiting the Barnett Shale, we eliminated approximately $1.9 billion of total future midstream and downstream commitments, leading to an expected increase in our operating income for 2017 through 2019 of $200 to $300 million annually.**

Chesapeake Energy Company, Annual Report (Form 10-K), at 44 (Feb. 3, 2017) (emphasis added).

to, among other things, shift repayment of Chesapeake's off-balance sheet loan from Access Midstream to the lessors.

56.     By taking the inflated deductions, and thereby reducing royalty payments, Defendants capitalized on a contract to which they were not parties, but through which they could produce guaranteed revenue by forcing class members to pay grossly inflated deductions.

57.     Notably, Chesapeake reported to investors in September 2013 that its expenses related to pipeline and marketing business roughly doubled in the months after it sold certain pipelines and that its revenues for that part of the business also increased accordingly, covering the new costs.[27]

58.     Industry analysts were at a loss to explain it. As reported by *ProPublica*:

o   Fadel Gheit, a seasoned industry analyst for the investment firm Oppenheimer, who estimated the figure was off by a decimal point before later confirming that it matched the numbers Chesapeake had reported to the SEC, stated, "[s]omething is wrong with this calculation … It can't be."

o   Kevin Kaiser, a financial analyst with Hedgeye, a private equity group in New York, stated, "[t]he change in marketing, gathering, compression revenue and expense is staggering."

o   None of the financial analysts who cover Chesapeake that ProPublica spoke with could explain the explosion in Chesapeake's marketing and transportation revenues and expenses using oil sales alone.[28]

59.     In late 2009, the Chesapeake entities sold 25% of some of their working interest to the French oil and gas conglomerate, Total E&P USA Inc. Total agreed to pay Chesapeake $2.25 Billion for this position, and agreed to the terms of the above market Gathering Agreement so that all of the excessive fees were charged to royalty owners by Total as well.

60.     When Total paid royalty on its working interest share, it deducted midstream

---

[27]   *See* ProPublica Report.
[28]   *Id.*

service costs. But Total realized that Chesapeake did not. When Chesapeake affiliates owned the midstream assets, Chesapeake's policy was to not take midstream deductions from royalties.

61.    Total then conspired with Chesapeake to change its policy and established course of dealing. Beginning with May 2011 production which was paid to royalty owners in July 2011, Chesapeake began charging royalty owners midstream deductions for what had been midstream assets owned by Chesapeake affiliates and now owned by Access Midstream.

62.    In 2012, Total paid another $2 Billion for 25% of the working interest in Ohio leases.

63.    In October 2016, Total bought the other 75% working interest from Chesapeake in the Barnett Shale in Texas, and in the process virtually admitted the excessiveness of the Access Midstream fees as Chesapeake paid $334 million to Access Midstream (now Williams) to terminate the unfair Gathering Agreement and "Total E&P USA will supplement Chesapeake's payment with $420 million to Williams for a fully restructured, competitive gas gathering agreement," according to Jose Ignacio Sanz, head of Total E&P in United States. *See* http://www.reuters.com/article/us-total-barnett-shale-idUSKCN11F1AU.

64.    In addition, Total agreed to pay another $138 million to be released from three other midstream capacity reservation contracts.

65.    Thus, in whole, $892 million was paid to get to a more fair gathering agreement. But none of the overcharge Midstream GCDTP Service Costs originally charged under the Access Midstream contract were reimbursed proportionately to the royalty owners.

## V.    USE OF INTERSTATE MAILS AND WIRES TO CAUSE INJURY TO PLAINTIFFS AND THE CLASS

66.    The scheme alleged herein constitutes mail and/or wire fraud in violation of 18

20

U.S.C. §§ 1341 and 1343, as well as depositing funds from specific criminal activities, in violation of 18 U.S.C. § 1957.

67.      Each of the intra-company or co-conspirator sales made by Defendants was an "intra-company gas sale," rather than an arm's-length sale reflecting the actual market price.

68.      The conduct of Defendants and their co-conspirators, including but not limited to Chesapeake Operating, LLC, and Chesapeake Exploration LLC, as described in this complaint, constitutes the execution of a scheme to deprive oil and gas lessors in Texas of royalties properly due them by means of fraudulent pretenses and representations through the use of the United States mail, in violation of 18 U.S.C. § 1341.

69.      Their use of the mails formed a central feature of the scheme and, by way of example and as described above, included sending oil and gas lessors royalty statements and royalty payments that reflected deductions for artificially inflated gas gathering and transportation fees pursuant to gathering agreements. Hundreds, and likely many thousands, of such royalty statements and royalty payments were sent to Texas royalty owners through the mails and interstate. Each of these statements and payments fraudulently represented that deductions for gas gathering and transportation costs were legitimately incurred and constituted permissible deductions from royalties under the oil and gas leases.

70.      The mail fraud was uniform and constituted a financial transaction based on a lease; every lease included the same requirement that Chesapeake would not commit fraud. Thus, all of the lessors were harmed and defrauded commonly and in the same method and manner by Defendants and their co-conspirators.

71.      Moreover, Defendants and their co-conspirators, including but not limited to Chesapeake Operating, LLC, and Chesapeake Exploration LLC, made fraudulent and untrue

statements regarding deductions and volume adjustments for midstream services that were represented to reflect legitimate costs rather than the scheme as alleged herein.

72.     By way of example, royalty statements sent to Plaintiffs each represent an instance of mail fraud by either hiding the excessive midstream deduction without delineating them or by delineating them without indicating they were excessive in amount (which Defendants knew and Plaintiffs did not).

73.     The conduct described above constituted multiple violations of the mail fraud statute, 18 U.S.C. § 1341, which is a predicate of the civil RICO Act, 18 U.S.C. §1962(c).

74.     In addition, Defendants and their co-conspirators, including but not limited to Chesapeake Operating, LLC, and Chesapeake Exploration LLC, have, on a monthly basis, transferred payments between themselves by wire, which payments were made pursuant to the non-arm's length and conspiratorial agreements described herein. This conduct constituted multiple violations of wire fraud, 18 U.S.C. § 1343, which is a predicate offense for purposes of 18 U.S.C. § 1962(c).

75.     At all relevant times, Defendants and their co-conspirators, including but not limited to Chesapeake Operating, LLC, and Chesapeake Exploration LLC, owe legal duties to render services to lessors. In all cases, those duties include extracting oil and natural gas and deducting expenses only where appropriate. The value of these services depended on Defendants Chesapeake Operating, LLC, and/or Chesapeake Exploration LLC rendering those services in an honest manner.

## VI.   CLASS ACTION ALLEGATIONS

76.     Plaintiffs bring this action individually and, pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2) and (b)(3), as representative of a Class defined as follows:

22

All royalty owners in Texas wells where Chesapeake Operating, LLC (f/k/a Chesapeake Operating, Inc.) or Chesapeake Exploration, LLC, including its affiliated predecessors and successors) is or was the operator (or working interest owner who marketed its share of gas and directly paid royalty to the royalty owners) and who were paid royalties for production of natural gas and other hydrocarbons from said wells from May 2011 to September 2016. The Class claims cover royalty payments for gas and its constituents, such as residue gas, natural gas liquids, helium, nitrogen, or drip condensate.

Excluded from the Class are: (1) the Office of Natural Resources Revenue, formerly known as the Mineral Management Service (Indian tribes and the United States); (2) all presiding judge(s) together with their immediate family members; (3) Defendants and their affiliates, their predecessors-in-interest, and their respective employees, officers, and directors; and, (4) Individual plaintiff royalty owners who sued Chesapeake for excessive deductions for gas marketed from Texas wells through Access Midstream before this suit was filed.

77.     The Class is so numerous that joinder of all members is impracticable.

78.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

79.     Plaintiffs' claims are typical of the claims of the Class. As alleged herein, Plaintiffs and members of the Class all sustained damages arising out of the Defendants' common course of unlawful conduct.

80.     There are questions of law and fact common to the Class, including but not limited to:

- o  Whether Defendants have engaged in a common scheme, plan and course of conduct to impose inflated gas gathering and transportation costs on oil and gas lessors through a collusive pricing structure;

- o  Whether Defendants' scheme has resulted in the improper deduction of inflated gas gathering and transportation costs from royalties owed to Plaintiffs and Class members and whether Chesapeake Operating, LLC and Chesapeake Exploration, LLC failed to pay Plaintiffs and Class members the proper due and owed oil and gas royalties;

23

o Whether Defendants, by compelling Chesapeake Operating, LLC and Chesapeake Exploration, LLC to separately contract with Access Midstream for inflated fees for services, have intentionally interfered with the agreements and contracts between Chesapeake Operating, LLC and Chesapeake Exploration, LLC and Plaintiffs and Class members without justification and resulting in the failure to pay Plaintiffs and Class members the proper amount due and owed for their royalty on oil and gas revenues;

o Whether Defendants have converted assets belonging to Plaintiffs and the Class;

o Whether Defendants have engaged in a civil conspiracy injuring Plaintiffs and the Class;

o Whether Plaintiffs and Class members have suffered damage as a result of Defendants' conduct; and

o The appropriate measure of damages.

81.    Class action status is warranted under Rule 23(b)(2) because Defendants have acted on grounds generally applicable to the Class thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

82.    Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

83.    Plaintiffs anticipate no difficulty in the management of this matter as a class action.

## VII.   CAUSES OF ACTION

### Count 1
### VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §§ 1961-1968

84.    Plaintiffs incorporate the preceding allegations by reference.

85.    Plaintiffs, each member of the Class, and each Defendant are "persons," as that term is defined in 18 U.S.C. §§ 1961(3) and 1962(c).

24

**The Enterprise**

86.     For purposes of this claim, the RICO "enterprise" is an association-in-fact, as the term is defined in 18 U.S.C. §§ 1961(4) and 1962(c), consisting of Defendants, (1) ACCESS MIDSTREAM PARTNERS, L.P (n/k/a WILLIAMS PARTNERS, L.P.); (2) CHESAPEAKE ENERGY CORPORATION; (3) CHESAPEAKE OPERATING, L.L.C.; (4) CHESAPEAKE EXPLORATION, L.L.C.; (5) CHESAPEAKE ENERGY MARKETING INC.; (6) CHESAPEAKE MIDSTREAM PARTNERS, LP; and (7) TOTAL E&P USA, INC., including their respective officers, directors, employees, agents, and direct and indirect subsidiaries (the "Enterprise"). The Enterprise is separate and distinct from the persons that constitute the Enterprise.

87.     The companies and individuals that constitute the Enterprise were associated in fact for the common purpose of enriching themselves at the expense of Texas royalty owners by defrauding the royalty owners through the withholding of proceeds from the sale of production rightfully owed such royalty owners and falsely and fraudulently representing to such royalty owners that no such sums were withheld and/or that such sums were withheld as deductions for the actual and reasonable costs of post-production activities associated with the sale of such production.

88.     At all relevant times, the Enterprise was engaged in, and its activities affected, interstate commerce.

89.     The proceeds of the Enterprise were distributed to its participants, including Chesapeake and Access Midstream.

90.     The enterprise in fact could not have succeeded if Defendants had not coordinated, worked together in shared interdependence, and shared profits. By doing so, Defendants advanced

25

the goals of the enterprise in fact and not simply their own.

91.     The enterprise was ongoing and worked together toward a common purpose: to deprive royalty owners of the full share of the royalties so that Defendants and Chesapeake could artificially show higher revenue on midstream processing costs (and, in turn, midstream revenue).

92.     All of the Defendants in the enterprise in fact worked together and cooperatively toward this common purpose.

93.     Each of the Defendants, expressly agreed to, and did, knowingly and willfully participate in the conduct of the Enterprise. The Enterprise  is the product of Chesapeake's past desperation for cash to cover its unsustainable debt burden. Chesapeake took its practice of creating affiliates to appropriate a disproportionate share of production revenues at the expense of royalty owners to another level by spinning-off one of its midstream affiliates, now Access Midstream, selling its remaining midstream assets to the former affiliate,  and then colluding with the now separate entity to secure an off-balance sheet loan repaid on the backs of royalty owners by withholding sales proceeds under the guise of inflated post-production costs. The depth of the collusive relationship amongst the Defendants is further illustrated by the fact that Access Midstream agreed to tie itself to services and equipment provided by other Chesapeake affiliates as a means to shield Chesapeake from incurring the full extent of the costs withheld from the royalty owners' payments.

94.     The Enterprise operated from at least September 2009 – September 2016.

95.     The Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which Defendants engage.

### The Pattern of Racketeering Activity

96.     At all relevant times, in violation of 18 U.S.C. § 1962(c), the Defendants

26

conducted the affairs of the Enterprise through a pattern of racketeering activity as defined in RICO, 18 U.S.C. § 1961(5), by virtue of the conduct described in this complaint. The Defendants have conducted the affairs of the Enterprise and participated in the operation and management thereof at least through the following conduct:

    a. Chesapeake intentionally and deliberately engaged in a pattern of conduct of establishing subsidiaries along the industry value chain from exploration to the final sales point with the intent and purpose of appropriating portions of the proceeds derived from the sale of such production rightfully owed royalty owners for itself. When Chesapeake became fatally cash-strapped in the late 2000's, it began to spin-off such affiliates, Access Midstream being but one such affiliate, leaving former Chesapeake employees, officers, and directors in positions of authority and control over these spun-off entities and using those close relationships to facilitate the fraudulent scheme of the Enterprise alleged herein.

    b. Defendants knew that the moneys withheld from royalty owners and paid to Access Midstream under the guise of the Gathering Agreements were far in excess of the actual and/or reasonable costs of such services and a reasonable return on investment;

    b. Defendants also knew and agreed to shield Chesapeake from the excessiveness of these fees through kickbacks wherein Access Midstream employed the equipment and services of Chesapeake;

    c. Defendants also knew and agreed that the inflated fees would be withheld from the payments to Texas royalty owners through Chesapeake Operating, LLC and/or Chesapeake Exploration, LLC and disguised as deductions from the owners' royalty payments on their monthly check stub statements;

d. The unlawful conduct by Defendants, through the alleged association-in-fact Enterprise, deprived thousands of royalty owners of their rightful royalty payments on production from wells that continue to produce hydrocarbons on a monthly basis, is continuous and open-ended, and was intended to continue, and continues today; and

e. Plaintiff and the members of the Class were the intended targets of the scheme that was facilitated by the knowing and purposeful involvement of Defendants. The financial harms suffered by Plaintiffs and members of the Class are the direct result of that conduct and were the intended and reasonably foreseeable consequence of such conduct.

### The Predicate Acts: Mail and Wire Fraud and Deposit of Funds

97.  The pattern of racketeering activity consisted of mail and/or wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.

98.  Defendants also violated 18 U.S.C. § 1957 by depositing payments received from the purchasers of the natural gas knowing the payments were derived from the unlawful activities of the wire fraud and/or mail fraud.

99.  Specifically, Defendants engaged in an intentional scheme to defraud royalty owners and to obtain money or property from said royalty owners through false or fraudulent pretenses, representations, and promises.

100.  The conduct of Defendants in violation of the mail and wire fraud statutes included sending check stubs and royalty statements that improperly reflected the true costs of the midstream services and intentionally overstated the price for midstream service deductions so that Defendants could enrich themselves at the expense of the royalty owners. Each check stub and

28

royalty statement, mailed month after month, was fraudulent and deceptive because Defendants did not disclose that they had engaged in intra-company affiliate sales to one and another, thereby concealing their fraud from the royalty owners. Nor did Defendants reveal to the royalty owners that the deductions taken for midstream service costs were far in excess of market rate, and that this was done specifically to enrich Defendants and prop up the Chesapeake scheme to defraud.

101.    Chesapeake Operating, LLC, and Chesapeake Exploration, LLC owe a contractual obligation to act honestly and fairly pay and account to the royalty owners. Chesapeake Operating, LLC and Chesapeake Exploration, LLC owe a duty to render those services reasonably, in good faith, and in an honest manner. Nevertheless, Defendants misused their position.

102.    Defendants also owe a duty not to charge unreasonable fees to Chesapeake Operating, LLC and Chesapeake Exploration, LLC which, as Defendants knew, would be passed on to royalty owners month after month.

103.    Each of the Defendants intentionally and willfully conspired and participated in the scheme to defraud the royalty owners. Specifically, each of the Defendants participated in devising and carrying out the scheme through the activities alleged above.

104.    It was reasonably foreseeable to the Defendants that the mails and/or wires would be used in furtherance of the scheme, and the mails and/or wires were in fact used to further and execute the scheme: the U.S. mails were used to mail the check stubs and royalty statements to every royalty owner, month after month.

105.    The nature and pervasiveness of the Enterprise necessarily entailed frequent wire and/or mail transmissions. Defendants utilized the mails and/or wires for the purpose of furthering and executing the scheme.

106.    The precise dates of such transmissions cannot be alleged without access to the books and records of the Defendants, but they have occurred and continue to occur on a monthly basis. Nevertheless, Plaintiffs can allege such transmissions generally and with reference to the royalty statements sent by mail to every royalty owner that owns an interest in Chesapeake wells in Texas and the simultaneous deficient payments made by wire to the same owners. Each mailing and wire carries the implicit promise that the accounting on the check stubs is accurate and proper and that the wire transfers are the full amounts owing the royalty owners in production for that given month.

107.    The scheme to defraud involved a financial transaction based on a written contract (a lease), which the Tenth Circuit has advised is properly addressed through a RICO class action.

108.    For the purpose of furthering and executing the scheme, the Defendants regularly transmitted and caused to be transmitted by means of wire communication in interstate commerce writings, electronic data, and funds, and also regularly caused matters and things to be placed in post offices or authorized depositories, or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier.

109.    The royalty statements are only examples of instances of the pattern of racketeering activity consisting of mail and/or wire fraud violations engaged in by the Defendants. Each electronic and/or postal transmission was incident to an essential part of the scheme. As detailed above, Defendants engaged in similar activities with respect to each member of the Class.

110.    Additionally, each such electronic and/or postal transmission constituted a predicate act of wire and/or mail fraud in that each transmission furthered and executed the scheme to defraud royalty owners.

111.    Defendants each participated in the scheme to defraud knowingly, willfully, and

30

with a specific intent to defraud royalty owners into bearing the full cost of falsely inflated, unauthorized charges in connection with their royalty payments.

112.     The predicate acts of mail and wire fraud constitute a pattern of racketeering activity as defined in 18 U.S.C. § 1961(5). The predicate acts were not isolated events, but were related acts aimed at the common purpose and goal of defrauding royalty owners to pay and incur the falsely inflated, unauthorized charges with respect post-production services and thereby enable Defendants to reap illicit profits.

113.     Defendants were common participants in the predicate acts. Their activities amounted to a common course of conduct, with similar pattern and purpose, intended to deceive royalty owners. These predicate acts are a part of the Defendants' regular way of doing business and will be repeated as to plaintiffs and the class well into the future.

114.     If any of the Defendants did not conduct or participate in the enterprise, all of the Defendants nevertheless conspired to do so, in violation of § 1962(d).

115.     RICO, 18 U.S.C. § 1962(d), provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

116.     Each of the Defendants is liable under § 1962(d) for conspiring to assist in the scheme to defraud the royalty owners, set forth in more detail above.

### Injury to Plaintiffs and the Class

117.     As a direct and proximate result of violations of 18 U.S.C. § 1962(c) and (d) by Defendants, Plaintiffs and the Class have been injured in their business or property within the meaning of 18 U.S.C. § 1964(c).

118.     Plaintiffs are the direct victims of the scheme to defraud, and no other group of plaintiffs or victims is better positioned to bring this suit. There is a direct line from the fraud

committed by Defendants to Plaintiffs.

119.    Plaintiffs and the Class had and continue to have sums withheld from their royalty on account of falsely inflated, unauthorized post-production costs by reason, and as a direct, proximate, and foreseeable result, of the scheme alleged. Plaintiffs' continued deprivation through inflated and unreasonable deductions evidence their reliance on the Defendants' misstatements.

120.    Moreover, the overcharging of Plaintiffs and the Classes for midstream services was an integral and necessary part of the scheme, as those overcharges constituted repayment of, among other things, the cash payment made by Access Midstream to Chesapeake and referenced in the *ProPublica* Report.

121.    Under the provisions of 18 U.S.C. § 1964(c), Defendants are jointly and severally liable to Plaintiffs and the Class for three times the damages sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

122.    Under the provisions of 18 U.S.C. § 1964(c), Defendants are jointly and severally liable to Plaintiffs and the Class for three times the damages sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

## Count 2
## UNJUST ENRICHMENT

123.    Plaintiffs incorporate the preceding allegations by reference.

124.    Defendants, by their policies and actions, benefited from, and increased their profits by effecting a scheme which deprived Plaintiffs and the Class of the full royalties due to them.

125.    Chesapeake benefited from the royalty amounts wrongfully withheld by its subsidiary, Chesapeake Operating, LLC, and/or Chesapeake Exploration, LLC, whose financial results are included in Chesapeake's financial statements and whose costs were substantially

32

reduced by not paying the proper royalty amounts.

126.    Access Midstream benefited from the royalty amounts wrongfully withheld by Chesapeake Operating, LLC and/or Chesapeake Exploration, LLC because some of the monies which should have been paid to the royalty owners were, instead, paid to Access Midstream.

127.    Defendants accepted and received the benefits of royalty monies properly due Plaintiffs and the Class. It is inequitable and unjust for Defendants to retain these monies, which were procured by fraudulent pretenses and representations.

128.    Plaintiffs and the Class are entitled to relief for this unjust enrichment in an amount equal to the benefits unjustly retained by Defendants, plus interest on these amounts.

### Count 3
### CIVIL CONSPIRACY

129.    Plaintiffs incorporate the preceding allegations by reference.

130.    Defendants have conspired and combined with each other, and with third parties, to make wrongful deductions from leaseholders' royalty payments, and have achieved a meeting of the minds, through either express or tacit agreement, on an object or course of action of the conspiracy, including depriving Plaintiffs and the Class of their right to royalties pursuant to leasehold contracts.

131.    Defendants have formed and operated a civil conspiracy with each other, performing as a part of the conspiracy numerous overt acts in furtherance of the common design, including one or more unlawful acts which were performed to accomplish a lawful or unlawful goal, or one or more lawful acts which were performed to accomplish an unlawful goal. Defendants conspired to convert Plaintiffs' and the Class's property.

132.    Defendants intended to injure, and succeeded in injuring, Plaintiffs and the Class to the extent of the wrongful deductions alleged herein without legal justification.

33

133.      As a result of the conduct of Defendants and the conspiracy, Plaintiffs and the Class have been damaged as described herein.

134.      As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the Class have suffered and continue to suffer damages. Plaintiffs and the Class are entitled to recover from Defendants all damages and costs permitted.

**Count 4**
**TORTIOUS INTERFERENCE WITH CONTRACT**

135.      Plaintiffs incorporate the preceding allegations by reference.

136.      The Defendants intentionally, purposefully, and knowingly forced Chesapeake Operating, LLC and/or Chesapeake Exploration, LLC to breach their lease agreements with Plaintiffs and the Class. Plaintiffs and the class have entered into lease agreements under which Chesapeake Operating, LLC or Chesapeake Exploration, LLC is the lessee.

137.      The Defendants negotiated their disguised loan asset sale with the knowledge and intent that the loan proceeds will largely be repaid through withholdings of royalties owed Plaintiffs and the Class and with the knowledge that such withholdings constitute a breach of the terms of the Plaintiffs' and Class' leases with Chesapeake Operating, LLC or Chesapeake Exploration, LLC

138.      The leases of Plaintiffs and the Class are not terminable at will by the Plaintiffs or the Class as to their respective leases.

139.      The Defendants conspired to procure these breaches and did procure such breaches through Defendant Chesapeake's complete control over the decisions and actions Chesapeake Operating, LLC and Chesapeake Exploration, LLC without any good-faith justifications.

140.      The Defendants were motivated by Chesapeake's dire need for cash, the loyalty of Access Midstream's key officers to Chesapeake, the sweetheart terms of the disguised loan in

34

favor of Access Midstream and the kickbacks to Chesapeake, and by the knowledge that the royalty owners harmed thereby are at such an informational disadvantage that they have no effective means to block the agreement between Defendants or prevent such breaches in any fashion.

141.    Plaintiffs and the Class have vested property interests in the mineral estates and subsequently produced minerals from the mineral estates. Plaintiffs and the Class have entered into the leases at issue herein with the expectation of receiving royalties from the sale of any minerals produced from the underlying mineral estate. Under the leases, implied covenants, and statutory law, Plaintiffs and the Class are owed many duties, including the duty of the Lessee to fulfill its obligations under the leases in good faith and operate the leaseholds as a reasonably prudent operator.

142.    The Defendants have acted together and forced Chesapeake Operating, LLC and Chesapeake Exploration, LLC to breach their duties to Plaintiffs and the Class by usurping a portion of Plaintiffs' and the Class' rightful royalties for their own self interests.

143.    The relationship between the parties is such that the royalty owners place full reliance on the good-faith and ethics of their lessees/operators to perform the covenants of the leases and remit their rightful royalties in full when due. In all practicality, the royalty owners have no ability to challenge the actions of the lessees/operators or audit their performance and payments without first filing suit and pursuing discovery on the matters in question.

144.    The Plaintiffs and the Class have suffered monetary damages as a result of the Defendants' interference with their contractual relationships with their lessee/operators in those amounts withheld from their royalty payments that represent costs above and beyond the actual cost of the services so provided by Access Midstream.

35

**Count 5**
**BREACH OF LEASE**

145.    Plaintiffs incorporate the preceding allegations by reference.

146.    Plaintiffs and the other Class Members entered into written, fully executed, oil and gas leases with Defendants.

147.    Those leases include implied covenants requiring Defendants to place the gas and its constituent parts in Marketable Condition at Defendant's exclusive costs and requiring Defendants to properly account for and pay royalty interests under the mutual benefit rule.

148.    At all material times, Plaintiff and the other Class Members have performed their terms and obligations under the leases by allowing Defendants to explore and produce gas under the leases;

149.    Defendants Chesapeake and Total breached the leases by deducting excessive midstream service costs from royalty owners in the following ways:

a.    Locking in an excessively long 20 year deal at excessive rates;

b.    Charging excessive gathering fees;

c.    Committing to minimum volumes that were never met;

d.    Paying excessive fee escalator clauses annually;

e.    Receiving kickbacks for back office support that were not credited to royalty owners; and,

f.    Agreeing to firm gathering reservation fees.

155.    As a result of Defendants' breaches, Plaintiffs and the other Class Members have been damaged through underpayment of the actual amounts due.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court enter a judgment against Defendants,

36

jointly and severally, and in favor of Plaintiffs and the members of the Class and award the following relief:

A.      Determine that this action may be maintained as a class action pursuant to Red. R. Civ. P. 23; direct that reasonable notice of this action, as provided by Fed. R. Civ. P. 23(c)(2) be given to the Class; and declare that Plaintiffs are the representatives of the Class and Plaintiffs' counsel are counsel for the Class;

B.      Require Defendants to pay for sending notice to the certified class of all royalty owners per their business records;

C.      Declare, adjudge and decree that the conduct alleged herein is unlawful;

D.      Enjoin Defendants from engaging in the conduct alleged herein;

E.      Award injunctive relief as the Court deems appropriate;

F.      Award compensatory, consequential, and general damages in an amount to be determined at trial;

G.      Award treble damages as permitted by law;

H.      Award costs and disbursements of the action;

I.      Award restitution and/or disgorgement of Defendants' ill-gotten gains, and the imposition of an equitable constructive trust over all such amounts for the benefit of the Class;

J.      Award pre- and post-judgment interest;

K.      Award reasonable attorneys' fees and costs;

L.      Award punitive damages;

M.      Award all such other and further relief as may be just and proper.

## IX.    DEMAND FOR JURY TRIAL

Plaintiffs and the Class demand trial by jury on all issues so triable.

37

Respectfully submitted,

/s/ Rex A. Sharp
Rex A. Sharp, OBA #011990
REX A. SHARP, P.A.
5301 W. 75th Street
Prairie Village, Kansas 66208
Tel: 913-901-0505
Fax: 913-901-0419
rsharp@midwest-law.com

J. Jeffrey Springer (pro hac vice pending)
SPRINGER & LYLE, LLP
1807 Westminster
Denton, Texas 76205
Tel: 940-387-0404
Fax: 940-383-7656
jeff@springer-lyle.com

Donald H. Ray (pro hac vice pending)
RAY & WILSON
6300 Ridglea Place Suite 1111
Fort Worth Texas 76116
Tel: 817-377-0500
Fax: 817-377-1232
dray@rayandwilson.com

C. Robert Burton, OBA #14195
The Burton Law Firm
320 South Boston Avenue, Suite 2400
Tulsa, OK 74103
Telephone: (918) 582-5100
Facsimile: (918) 584-1425
RobtBurton@aol.com

**ATTORNEYS FOR PLAINTIFFS**